**[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 244.]**

COLUMBUS BAR ASSOCIATION *v.* EWING.

**[Cite as *Columbus Bar Assn. v. Ewing*, 1996-Ohio-317.]**

*Attorneys at law—Misconduct—Indefinite suspension—Making materially false statement in bar application by failing to reveal real estate sales license and suspension of that license—Engaging in conduct involving fraud, deceit, dishonesty, or misrepresentation—Engaging in conduct that adversely reflects on fitness to practice law—Accepting employment where exercise of judgment on behalf of client may be adversely affected by attorney's own interests, without client's consent after full disclosure— Continuing to represent two or more clients where attorney's independent judgment on behalf of a client may be adversely affected by multiple representation, without client's consent after full disclosure—Attempting to limit liability for personal malpractice.*

(No. 95-801—Submitted September 27, 1995—Decided March 6, 1996.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 93-50.

————————————

{¶ 1} In a complaint filed on August 16, 1993, relator, Columbus Bar Association, charged respondent, Charles W. Ewing of Amlin, Ohio, Attorney Registration No. 0025146, with two counts of professional misconduct involving violations of DR 1-101(A) (making a materially false statement in attorney's bar application), 1-102(A)(4) (engaging in conduct involving fraud, deceit, dishonesty, or misrepresentation), 1-102(A)(6) (engaging in conduct that adversely reflects on fitness to practice law), 5-101(A) (accepting employment where exercise of judgment on behalf of client may be adversely affected by attorney's own interests, without client's consent after full disclosure), 5-105(A) (accepting employment

where exercise of attorney's independent professional judgment on behalf of client may be adversely affected, without client's consent after full disclosure), 5-105(B) (continuing to represent two or more clients where attorney's independent judgment on behalf of a client may be adversely affected by the multiple representation, without the client's consent after full disclosure), and 6-102(A) (attempting to limit one's liability for personal malpractice). A panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board") heard the matter on July 29 and November 4, 1994.

{¶ 2} The panel found respondent in violation of DR 1-101(A), as alleged in Count One, because he had not "fully, truthfully and accurately" answered several questions as required on his application for admission to the Ohio Bar. Respondent became licensed in October 1978 to sell real estate in Ohio, and the application for this license had required him to disclose whether he had been convicted of crimes or had unsatisfied judgments against him. It had also required another licensed realtor to certify to respondent's good reputation, truthfulness, and honesty. However, when asked in his bar application whether he had ever held or applied for a license, the procurement of which required proof of good character, respondent did not reveal his real estate sales license. Moreover, when asked whether he, as the holder of any such license, had ever been "reprimanded, censured, or otherwise disciplined" and whether any such license had ever been revoked, respondent concealed that the Ohio Real Estate Commission had issued a thirty-day suspension of his real estate sales license on or about July 30, 1981. Respondent also concealed this information in response to the following bar application inquiries and instruction: "Have you ever been suspended, disqualified or disciplined as a member of any profession; *** or have any charges been made or filed or proceedings instituted against you? *** If your answer is 'Yes,' state the facts in detail."

**{¶ 3}** Another question on respondent's bar application required him to list all legal proceedings, whether civil, criminal, quasi-criminal, administrative, or before a juvenile court, to which he had been a party. Respondent did not identify the administrative proceeding that resulted in the Ohio Real Estate Commission's decision to suspend his real estate sales license, his appeal of that decision to the Common Pleas Court of Franklin County, or his further appeals to the Court of Appeals for Franklin County and to the Supreme Court of Ohio.

**{¶ 4}** Respondent defended his failure to disclose his real estate sales license and its suspension, arguing that the bar application questions had not specifically requested this information. The panel rejected his argument that he had not needed to show proof of good character to obtain the real estate sales license. The panel also rejected respondent's arguments that the Ohio Real Estate Commission's order and the subsequent appeals were not "proceedings," nor did real estate sales constitute a "profession," for the purpose of the bar application questions. The panel considered these latter arguments disingenuous, noting that respondent, who was in law school at the time of the suspension order and appeals, had expressed concern in the common pleas court that the suspension might adversely affect his legal career. The panel concluded that respondent had deliberately interpreted the bar application questions to avoid revealing the suspension of his real estate sales license.

**{¶ 5}** The panel also found that respondent violated DR 1-102(A)(4), 1-102(A)(6), 5-101(A), 5-105(A), 5-105(B), and 6-102(A), as alleged in Count Two, because he attempted to purchase for himself and his business associate, who was also a client, the farm and home of two other clients without their knowing consent to the transaction. Respondent agreed to represent Dale and Vonna Mowery, who were farmers facing financial adversity, and to assist them in managing their debt. The Mowerys' farm secured a first mortgage held by Federal Land Bank ("FLB") and a second mortgage held by Farmers Home Administration ("FmHA"), which

also extended to their home. Beginning in 1989, respondent and the Mowerys explored different methods by which to save the Mowerys' farm and home, including the Mowerys' participation in a "net recovery buyout"--the sale of three parcels of their property to pay off creditors, and a reorganization pursuant to a Chapter 12 bankruptcy proceeding. The net recovery buyout program was a financial plan offered by FmHA that allowed farmers to buy or sell collateral for the sum the FmHA expected to realize in liquidation, and, over the succeeding two-year stated period, to amortize the remaining debt. At some point in 1989, the Mowerys decided against borrowing from relatives the $33,000 needed to participate in the buyout program and concluded that they (the Mowerys) could not raise the funds from any other source. Respondent advised the Mowerys that he knew of an investor who could lend them the necessary funds, but he did not identify the investor, who was actually another of respondent's clients with whom respondent had a business relationship. The Mowerys did not accept this offer and authorized respondent to file the Chapter 12 bankruptcy petition. They also authorized their realtor, Darwin Allen, to list the three parcels of their property for sale.

{¶ 6} Respondent, however, continued to negotiate the Mowerys' participation in the net buyout recovery program with representatives of FmHA. By the end of April 1990, FmHA had agreed to revive the previously offered plan that had expired in May 1989. The Mowerys testified that respondent did not secure their specific consent for these negotiations and that he did not advise them before he dismissed their bankruptcy petition in the beginning of April 1990.

{¶ 7} In the meantime, Allen was contacting prospective buyers for the Mowerys' three parcels of property. Relying on respondent's representation that he had arranged for an investor to finance the buyout and remove the various mortgage liens on the property, Allen arranged for a closing on Monday, April 30, 1990. On Friday, April 27, 1990, respondent dropped off with Mrs. Mowery at the

Mowerys' farm a document entitled "Memorandum of Settlement and Conflicting Interest of Counsel" to prepare the Mowerys' for the closing. This document advised of the following terms, among others:

1. FmHA had agreed to "debt settle" the remaining balance between the Mowerys and FmHA;

2. The "debt settle" amount was $33,000, for which FmHA would release the Mowerys from all liability to FmHA, release all of its security interests, and also "insist on a second mortgage from the Mowery's [*sic*] at the time of the debt settle which [would] read that in the event the Mowery's [*sic*] [sold] the security at a profit or refinance[d] the property, FmHA would have a lien on the properties which would have to be paid from the proceeds";

3. The Mowerys "[had] known of the amount necessary to debt settle with FmHA for several weeks and [had] been unable to raise the money, despite the fact that an investor [would] almost certainly profit a substantial amount from the investment";

4. FLB had demanded "immediate payoff" of an "approximately [$]60,000 plus" loan. "Mowery's [*sic*] could [have] stay[ed] in the Chapter 12 and 'reamortize[d]' the balance owed to FLB." However, "Mowery's [*sic*] desire[d] not to stay in the Chapter 12 and did not believe that they could [have] afford[ed] the payments necessary if they [had] stay[ed] in the Chapter 12";

5. "Mowery's [*sic*] ha[d] been unable to find an investor who would provide them the money necessary to settle despite the opportunity for the investor to profit substantially. Mowery's [*sic*] [had] expressed as a last resort, a desire to allow an investor to purchase all of the land for an amount equal to the balance of FmHA's settlement, the entire payoff or assumption of the liability of FLB by the investor, and to fully pay the legal fees incurred by them in the filing of the Chapter 12 bankruptcy (approximately [$]10,000)";

6. "Mowery's [*sic*] had agreed to pay a [$]2,000 retainer to [respondent] prior to the filing of the bankruptcy but [had been] unable to pay prior to the filing of the bankruptcy by [respondent]. This fact [had] not been communicated to [respondent] until after the bankruptcy had been filed and [respondent] was expecting his retainer. No retainer [had] ever [been] paid to [respondent]";

7. "There [were] pending sales on the ground which would retire the FLB debt immediately and part of the FmHA debt as well. No funds [were] available to pay [respondent] without the sale of the ground. Mowery's [*sic*] would not be allowed to sell the ground and retain the limited balance to FmHA hence the need to sell the ground";

8. "[Respondent] [had] approached an investor who [was] a client of [respondent's] and with whom [respondent] had an extensive joint business interest and [had] asked to have the money invested to cause this settlement to be finished. This investment [would] almost certainly [have] allowed the investor and [respondent] to make a substantial profit. Respondent [had] not urged or persuaded Mowery's [*sic*] in any way to allow this sale. Mowery's [*sic*] [had] had the advice of their business manager Ray Tope throughout this venture and ha[d] consulted with him"; and

9. "Mowery's [*sic*] wish[ed] to purchase their home back from the investor. The market value of the home [was] approximately [$]50,000. Mowery's [*sic*] [would] be allowed to pay [$]40,000 for the home. This purchase [would] be on a land contract which [would] be recorded at the court house and [would] create a binding interest in the Mowery's [*sic*]. Payments [would] be $386.00 per month for 20 years at 10% interest. In the event they [were] unable to make payments as agreed the investor [would] no doubt be allowed to retake the property without foreclosure for a period of several years or until at least 20% of the principal [had been] paid by the Mowery's [*sic*]. Mowery's [sic] believ[ed] they [would] be able to make all the payments."

**{¶ 8}** The Memorandum of Settlement and Disclosure of Conflicting Interest of Counsel also set forth these "Representations by the Mowerys":

"1.  Mowery's [*sic*] know and have known that [respondent] has an interest in the investment and that he will almost certainly profit from this settlement beyond the payment of his fees.

"2.  [Respondent] represents the investor and has a personal interest in the transaction.  He is not representing Mowery's [*sic*] on the sale.  However, he has represented their interests with FmHA [and] FLB ***.

"3.  [Respondent] represents that he knows of nothing regarding this transaction given the facts listed above which in any way would or could harm Mowerys.

"4.  Mowerys are free to get separate legal advice and in fact [respondent] would encourage them if they so choose.

"5.  [Respondent] has advised Mowerys that there may be tax consequences to them due to the settlement.  [Respondent] has never held himself out to be a tax expert nor has he given Mowerys any tax advice.

"6.  Mowerys are not relying on [respondent] for any tax advice.

"7.  Mowerys have carefully considered these facts and after considerable thought do not believe that [respondent] is 'taking their farm' and represent that they will not make any such statements to anybody period."

**{¶ 9}** The Mowerys testified that they knew nothing of the terms described in respondent's memorandum.  When they realized that respondent intended them to deed their farm and home to him and his client/business associate, the Mowerys believed they were in imminent danger of losing this property and had no alternative than to request financial assistance from Mrs. Mowery's mother.  Mrs. Mowery's mother agreed to lend them the necessary $33,000, and the Mowerys paid off the FmHA mortgage on Monday morning before the closing scheduled for that afternoon.  Mr. Mowery also called respondent that day and discharged him.

The three parcels of property were subsequently sold to the prospective buyers, and the Mowerys paid off the FLB mortgage with the proceeds from these sales.

{¶ 10} In defense of his actions, respondent claimed that he had discussed the revived buyout arrangement with the Mowerys, as well as with Allen and Ray Tope, who had acted as a financial consultant to the Mowerys during the years 1986 through 1989. Tope confirmed that he was authorized to speak on the Mowerys' behalf regarding their financial situation and that he and respondent had discussed a buyout plan in late 1989. Tope recalled advising respondent of the Mowerys' understanding that an investor would lend them the funds needed for the buyout; however, he also recalled advising respondent of the Mowerys' objection to respondent's personal involvement as an investor and their fear that he might take advantage of their financial distress. Similarly, Allen testified that the Mowerys understood that respondent had procured an investor to lend them money for the buyout, but they were stunned to learn that respondent himself would also participate as an investor.

{¶ 11} The panel found, based on clear and convincing evidence, that respondent had not sufficiently explained the terms of the buyout option he had revived ostensibly for the Mowerys' benefit and, therefore, they could not have offered their informed consent to the transaction. The panel further found that:

"*** [W]hile representing Mr and Mrs. Mowery, Respondent also represented an investor whose interests were in direct conflict with those of Mr. and Mrs. Mowery. To compound this obvious conflict of interest, Respondent had a financial relationship with the investor ***. Furthermore, the timing of Respondent's actions in delivering the Memorandum to Mr. and Mrs. Mowery on Friday, April 27, 1990, left them in a vacuum of confusion and [de]void of independent legal guidance."

{¶ 12} In recommending a sanction for this misconduct, the panel considered the testimony of two attorneys and two clients who expressed high

8

regard for respondent's professional competence and integrity. However, the panel also considered that respondent had been disciplined for a previous similar violation of DR 5-105(B) in *Columbus Bar Assn. v. Ewing* (1992), 63 Ohio St.3d 377, 588 N.E.2d 783.

{¶ 13} Relator urged the panel to impose an indefinite suspension; respondent urged dismissal of the complaint on the ground that relator's investigation was biased, unreasonably delayed, and prejudicial. The panel rejected both suggestions and recommended a two-year suspension from the practice of law, with one year of the sanction period suspended on the condition that respondent commit no further misconduct for a period of three years.

{¶ 14} The board adopted adopted the panel's report, including its findings of fact, conclusions of law, and recommendation.

———————————

*Bloomfield & Kempf* and *David S. Bloomfield*; *Michael Distelhorst, Ronald L. Redmon* and *Bruce A. Campbell*, Bar Counsel, for relator.

*Charles W. Ewing, pro se*; *Lucas, Prendergast, Albright, Gibson & Newman* and *Rankin M. Gibson*, for respondent.

———————————

*Per Curiam.*

{¶ 15} In his objections to the board's report, respondent argues that the evidence did not establish the charged violations of DR 1-101(A), 1-102(A)(4), 1-102(A)(6), 5-101(A), 5-105(A), 5-105(B), and 6-102(A). With respect to Count One, respondent asserts that the suspension of his real estate sales license did not result from any "proceedings" referred to in the bar application. We reject this argument because Question 12(a) in the application unmistakably asked him to disclose whether he had ever been a party to "any action or legal proceeding," and it specifically identified "civil" and "administrative" matters, which plainly include proceedings before the Ohio Real Estate Commission and appeals therefrom.

Moreover, we agree with the board that proof of good character was required for respondent to obtain his real estate sales license and that real estate sales is a "profession" for purposes of the bar application. Accordingly, we concur that respondent violated DR 1-101(A) in failing to reveal his real estate sales license and the suspension of that license.

{¶ 16} With respect to Count Two, respondent insists that the Mowerys realized he was proceeding with the buyout option because (1) they were negotiating the sale of property subject to a lien the executed buyout would remove, and (2) FmHA would not consider the buyout until the Chapter 12 bankruptcy petition had been dismissed. However, we agree with the board's finding that respondent did not fully advise the Mowerys of his revival of the net recovery buyout option, particularly his anticipated involvement in that transaction. The Mowerys' testimony, as corroborated by Allen and Tope, convinces us that they had no knowledge of respondent's intention to purchase their home and farm for himself and his business associate/client. Moreover, we view respondent's delivery of his memorandum on the Friday before the scheduled closing as an abrupt abandonment of the Mowerys, a violation of their trust, and a power play designed to further his own interests and those of his business associate/client. We are appalled by respondent's purchase scheme and by his coercive tactics to gain the Mowerys' approval of it. Accordingly, we also concur that respondent violated DR 1-102(A)(4), 1-102(A)(6), 5-101(A), 5-105(A), 5-105(B), and 6-102(A), as found by the board..

{¶ 17} Respondent also argues in his objections that the investigation of the charges against him was biased, prejudicial, and required dismissal of the complaint. In the main, he complains that the Mowerys received assistance in filing their grievance from a professional adversary of respondent's, that relator failed to sufficiently investigate a complaint respondent lodged against that attorney, that a second professional adversary initially participated in the investigation and

withheld exculpatory evidence, that an attorney associated with a third professional adversary signed the formal complaint against him, and that members of the investigating committee threatened reprisals against respondent and his counsel. We see little evidence, apart from respondent's own representations, to support the conspiracy he alleges and, regardless, find no evidence of prejudice. Ample evidence establishes the misconduct determined by the panel and board, and nothing contained in this record or proffered absolves respondent. Accordingly, this objection is overruled.

**{¶ 18}** Respondent further argues for dismissal on the ground that relator failed to complete its investigation within the one-year time limit imposed by Gov.Bar R. V(4)(D)(2), raising a presumption of unreasonable delay. Investigations that extend beyond one year from the date the grievance is filed are prima facie evidence of unreasonable delay under Gov.Bar R. V(4)(D)(3); however, no grievance can be dismissed under the rule without proof that respondent was denied his rights to a fair hearing. No such proof exists in this case, as respondent was provided every opportunity to present relevant evidence in his defense during the two days in which the hearing was conducted. Accordingly, this objection is also overruled.

**{¶ 19}** Respondent further argues a denial of due process, claiming, in essence, that he was denied discovery of exculpatory evidence, that the hearing panel declined to admit portions of his evidence, and that the hearing transcripts were not available for review when his post-hearing brief was due. We see no indication that respondent was denied proof that could establish the Mowerys' informed consent to his and his client/business associate's purchase of their home and farm. Moreover, we tend to agree with the panel's evidentiary rulings, most of which appropriately confined respondent to relevant matters. Furthermore, we have no reason to conclude that respondent was denied access to the hearing transcripts in this case--the transcripts were filed with the board by November 22,

1994, and respondent's post-hearing brief was filed on January 10, 1995. Accordingly, we overrule this objection as well.

**{¶ 20}** Having adopted the board's findings of misconduct and overruled respondent's objections, we turn to relator's objection to the sanction recommended by the board. Relator asserts that respondent's misconduct is at least sd egregious as that for which we have imposed indefinite suspensions in several recent cases, most notably *Disciplinary Counsel v. Doyle* (1995), 71 Ohio St.3d 574, 645 N.E.2d 1244 (attorney indefinitely suspended for failing to register and repeatedly representing himself as licensed and in good standing), and *Disciplinary Counsel v. Mesi* (1995), 72 Ohio St.3d 45, 647 N.E.2d 473 (attorney indefinitely suspended upon his conviction of a felony, his concealment of a client's assets, and his unauthorized loan of one client's funds to another, among other disciplinary infractions). We agree.

**{¶ 21}** In assessing respondent's conduct toward the Mowerys, the panel stated:

"Mr. and Mrs. Mowery believed, after reading the Memorandum [of Settlement and Conflicting Interest of Counsel], that they would lose their property if they did not deliver Thirty Three Thousand Dollars ($33,000.00) to Farmers Home Association [sic, Administration] on Monday[,] April 30, 1990. Mr. and Mrs. Mowery were without independent legal counsel to assist them in this eleventh hour drama orchestrated and designed by Respondent. Clearly Respondent viewed his own self interest above that of his clients, Mr. and Mrs. Mowery. The Respondent now wishes to only praise his conduct because Mr. and Mrs. Mowery were able to save their land and home from foreclosure. It was not the efforts of Respondent, but the generosity of Mrs. Mowery's mother that resulted in resolving the crisis set in motion by Respondent."

**{¶ 22}** Respondent preyed upon the Mowerys' economic distress, trust, and lack of expertise in financial management. His conduct warrants a more severe

penalty than a one-year actual suspension followed by a year of probation. Accordingly, we order that respondent be indefinitely suspended from the practice of law in Ohio. Costs taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

―――――――――――――